UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

COREY BARKER,

               Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,

               Defendant.

Case No.: 3:18-CV-01624-LAB(KSC)

**REPORT & RECOMMENDATION RE: PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DOC. NO. 17] & DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT [DOC. NO. 22]**

Plaintiff Corey Barker seeks judicial review of defendant Social Security Commissioner's determination that he is not entitled to disability insurance benefits. Plaintiff has filed a Motion for Summary Judgment and defendant has filed a Cross-Motion for Summary Judgment. (Doc. No. 17 & 22.) At issue is defendant's assessment of plaintiff's Residual Functional Capacity ("RFC")[1] Plaintiff contends that the RFC he was assigned is not supported by substantial evidence because the Administrative Law Judge

---

[1]     An RFC is "the most" the plaintiff can do, despite any limitations. <u>Dominguez v. Colvin</u>, 808 F.3d 403, 405 (9th Cir. 2016).

("ALJ") failed to properly analyze and weigh certain opinion evidence. Specifically, plaintiff argues that the ALJ improperly afforded "little weight" to the opinions of examining physician Dr. Thomas Moyad, the two State Agency consultants and plaintiff's mother and improperly relied on the opinions of examining physician Dr. Thomas J. Sabourin. (Doc. No. 17, pp. 10-11.) For the reasons set forth below, the Court recommends plaintiff's Motion for Summary Judgment be **DENIED** and defendant's Cross-Motion for Summary Judgment be **GRANTED**.

## I.  PROCEDURAL HISTORY

Plaintiff filed an application for disability insurance benefits on July 21, 2014, alleging a disability onset date of March 23, 2014. (Administrative Record ("AR") at 160.) Plaintiff's claim was denied at the initial and reconsideration stages and plaintiff, therefore, requested a hearing before an ALJ. (Id. at 111-13.)

## I.  FACTUAL BACKGROUND

Plaintiff was born on May 31, 1959. (Id. at 71.) He has worked in the furniture, home improvement and construction industries and as a cook. (Id. at 46, 166-69.) Plaintiff reported that he has not worked since his disability onset date of March 23, 2014.[2] (Id. at 44.) He went to live with and take care of his parents after he separated from his wife. (Id.

---

[2]      Although plaintiff reported he has not worked since March 23, 2014, the record indicates he received unemployment insurance benefits (UIB) after that date, specifically in the second and third quarters of 2014 and the first quarter of 2015. In order to receive UIB one must certify he or she is able to work and is looking for employment. (AR at 15-16 & 174-175, http://www.edd .ca.gov/unemployment/Eligibility.htm). Additionally, he testified at the Administrative Hearing on September 12, 2016, that he had been working part-time, zero to 12 hours a week, delivering flowers, since May 2016.(Id. at 43-44.) Plaintiff's medical records also evidence that plaintiff worked after his alleged disability onset date. On June 22, 2016, notes prepared by his physical therapist indicate plaintiff reported the flower shop where he worked "moved to another building and he has had to carry heavy counters" (Id. at 547-548.) On June 29, 2016, he reported an "increase in back aggravation due to lifting/moving objects for work" (Id. at 545-546.)  Notes from a physical therapy session on July 11, 2016, indicate plaintiff missed his physical therapy appointment the prior week but he still worked.  (Id. at 542-543.) Plaintiff also reported to consultative examining physician Dr. Thomas Sabourin, that he stopped working the flower delivery job on September 27, 2016. (Id. at 570.)

at 47.) Now he lives alone. He alleges that his ability to do work is limited by his back pain and anxiety. (Id. at 49-50.)

## II.    MEDICAL RECORDS

Medical records that are relevant to plaintiff's argument the ALJ's RFC assessment is not supported by substantial evidence and this Court's review thereof are summarized below.

### A. Kekoa C. Ede, M.D., Neighborhood Healthcare, Treating Psychiatric Specialist

Plaintiff was seen by Dr. Ede on August 21, and September 18, 2013, for a psychiatric evaluation. (Id. at 288-292.) On these visits, plaintiff reported that he was not able to sleep very well, he was "pretty anxious" about a job interview and was having anxiety attacks twice a week. (Id. at 288.) On September 18, 2013, Dr. Ede noted that plaintiff seemed well developed and nourished with no acute distress. (Id.) Psychologically, Dr. Ede found no delusions or hallucinations and that plaintiff was cognitively alert and oriented. (Id.) Dr. Ede diagnosed plaintiff with panic disorder without agoraphobia and prescribed him Sertraline and Gabapentin. (Id. at 288-91.)

### B. William Bailey, M.D., Partners Urgent Care, Treating Physician

Dr. Bailey saw the plaintiff on April 15, 2014, for lower back pain. (Id. at 351.) At that time, plaintiff reported he had terrible back pain making it difficult to walk or move. (Id.) Dr. Bailey observed plaintiff to be uncomfortable and exhibiting very antalgic position changes. (Id.) He noted plaintiff had right hip shift elevation, his back was very tender, he experienced paralumbar spasms and he had very guarded motion. (Id.) Dr. Bailey diagnosed plaintiff as having lumbar sprain and strain, prescribed him a Toradol injection as well as Norco and Cyclobenzaprine and instructed plaintiff to seek further treatment if he had no improvement. (Id. at 351-52.)

/ /

/ /

/ /

3

## C. Shahla Ramin, M.D., Vallette and Associates, Consultative Examining Psychiatrist Specialist

Plaintiff saw Dr. Ramin on September 30, 2014, for a consultative psychiatric evaluation. (Id. at 304-06.) Dr. Ramin noted that it was difficult to render a psychiatric opinion because no psychiatric records existed at the time, so he relied on plaintiff's self-report and his brief observations during this visit. (Id. at 305.) Dr. Ramin's impression was that plaintiff had adjustment disorder with depressed mood and psychological and environmental (occupational) problems. (Id. at 306.) Dr. Ramin assigned plaintiff a GAF score of 65. (Id.) He found no real limits on plaintiff's mental or social abilities. (Id. at 305-06.) He further noted that plaintiff is able to complete simple and detailed tasks and activities of daily living without supervision. (Id. at 305.)

## D. Thomas Moyad, M.D., Orthopedic Surgery, Consultative Examining Physician

Plaintiff first saw Dr. Moyad, an orthopedic surgeon, on October 1, 2014, for evaluation of plaintiff's chief complaint, his back problems. (Id. at 309-312.) Dr. Moyad's general examination findings were: (1) the trunk and extremities demonstrated TTP [tender to palpitation] along medial scapula border on the left upper back; (2) mild TTP on lumbar spine midline; (3) positive SLR [straight leg raise] in supine position on the left side with pain radiating to thigh, negative SLR on right side; (4) pain in the right shoulder with 160 degrees flexion and positive Hawkin's sign on the right shoulder; (5) pain in left medial scapula with full left shoulder flexion at 180 degrees; (6) positive crepitus in the right Subacromial shoulder with circular motion at the GHJ [glenohumeral joint]; (7) lumbar spine is painful with radiating pain down the left leg when ranging to maximal 80 degrees of lumbar flexion; (8) pain with 30 degrees lumbar extension without radicular symptoms; (9) pain (noted with facial grimace) with lateral bending of the lumbar spine bilaterally to 30 degrees; and (10) mild lumbar spasm palpation. (Id. at 310.) He also conducted a comprehensive range of motion test. (Id.) The only finding was pulses in the bilateral distal extremities. (Id.)

4

Dr. Moyad ordered a spine exam which showed: (1) mild anterolisthesis of L4 and L5 with mild disc space narrowing present at L4/L5 and L5/S1; (2) mild anterolisthesis of L4 and L5 which may be related to pars defect at L4; (3) peri-apophyseal sclerosis present from L3/L4 to L5/S1; and (4) formation of anterior osteophyte at L4 and L5. (Id. at 312, 321.) The impression from this exam was that plaintiff has moderative degenerative changes with anterolisthesis (mild) at L4 and L5. (Id.)

Based on the above examinations and findings, Dr. Moyad diagnosed plaintiff with: (1) lumbar spondylosis and L4-5 Spondylosis with Stenosis; (2) mild left leg radiculopathy; (3) right thoracic back rhomboid chronic strain; and (4) left shoulder sub-acromial impingement/Bursitis. (Id. at 312.)

Dr. Moyad also completed a functional assessment for the plaintiff. (Id.) He opined that in an 8-hour workday with normal breaks, plaintiff can be expected to sit 6 hours and stand or walk no more than 6 hours and that he can lift/carry 20 pounds occasionally and 10 pounds frequently. (Id.) The main limiting factors identified were painful lumbar Stenosis, Radiculopathy, and Degenerative Spondylolisthesis with evidence of nerve root impingement. (Id.) As to postural limitations, Dr. Moyad found plaintiff could be expected to climb, stoop, bend, and crouch only occasionally due to his degenerative lumbar spine and intermittent radicular symptoms. (Id.) He further noted plaintiff's manipulative limitations, finding he should be limited in reaching with his right shoulder because of Subacromial Bursitis, which was observed during the exam with a demonstration of pain when reaching overhead. (Id.)

### E. J. Hartman, M.D., State Agency Consultant

On November 13, 2014, Dr. Hartman conducted a consultative review of medical records relating to plaintiff's primary diagnosis of discogenic and degenerative back disorder and secondary diagnosis of affective mood disorder. (Id. at 70-82.) Specifically, he reviewed the medical records from Dr. Ramin, Dr. Moyad, Dr. Ede and Dr. Bailey, which are summarized above. (Id. at 72-74.) He gave great weight to the opinions of Dr. Ramin and Dr. Moyad. (Id. at 78.)

Based on these records, Dr. Hartman concluded plaintiff's back disorders were severe and his affective mood disorder was not severe. (Id. at 77.) He assessed that plaintiff was mildly restricted with respect to activities of daily living, had mild difficulties in maintaining social function and mild difficulties in maintaining concentration, persistence, and pace. (Id.) He noted that one or more of plaintiff's impairments can be expected to cause his pain or other symptoms, but observed that plaintiff's statements about the intensity, persistence and limiting effects of his symptoms were not supported by the medical evidence alone. (Id. at 78.) The external limitations he determined to be applicable to plaintiff are: (1) can occasionally carry/lift 20 pounds; (2) can frequently carry/lift 10 pounds; (3) can stand or walk with normal breaks for 6 hours in an 8-hour work day; (4) can sit with normal breaks for 6 hours in an 8-hour work day; and (5) can push and pull other than that shown for lift/carry. (Id. at 79.) Regarding postural limitations, Dr. Hartman noted plaintiff could never climb ladders, ropes, and scaffolds, but could occasionally climb ramps, balance, stoop, crouch and crawl. (Id.) Dr. Hartman believed plaintiff frequently had manipulative limitations such as reaching in any direction, and specifically reaching left and overhead. (Id. at 79-80.)

### F. A. Khong, M.D., State Agency Consultant

On February 5, 2015, Dr. Khong performed a consultative review of plaintiff's back and affective mood disorder. (Id. at 84-95.) His review was limited to the records from Dr. Ramin, Dr. Moyad, Dr. Ede and Dr. Bailey. (Id. at 85-87.) He gave great weight to the opinions of Dr. Ramin and Dr. Moyad, but noted Dr. Moyad had a short relationship with plaintiff. (Id. at 93.)

Dr. Khong noted there was no change in plaintiff's condition and he had no new physical or mental limitations. (Id. at 85.) He concurred with the external limitations assigned by Dr. Hartman. (Id. at 91.) Dr. Khong projected improvement with physical therapy, and that plaintiff would be capable of medium lifting and carrying and occasional stooping by April 1, 2015, at which point plaintiff could perform past relevant work. (Id. at 85, 93-94.)

6

**G. Family Health Centers of San Diego, Treating Medical Professionals (2014-2015)**

*1. Suriti Kundu, M.D. and Steven Santoyo, M.D. (October 2014 - February 2015)*

Plaintiff started receiving treatment at Family Health Centers of San Diego on October 2, 2014. (Id. at 332-34, 495-497.) At his first visit he was seen by Dr. Kundu. (Id.) Plaintiff reported having recent panic attacks, which Dr. Kundu theorized may be due to mild depression. (Id.) With respect to his back problems, plaintiff reported his pain level as 7 out of 10, which he admitted was more than usual. (Id.) He denied having any weakness, numbness or tingling. (Id.) Dr. Kundu noted subjective tenderness in the left lower back to the left of the spine and ordered physical therapy, x-rays and lab work. (Id.)

On October 16, 2014, plaintiff returned to Dr. Kundu to review the lab results and x-rays. (Id. at 335-337, 498-500.) The x-rays showed plaintiff had: (1) forward subluxation of L4 and L5 with probable associated pars defect; (2) narrowing of L3, L4, and L5 with osteophyte formation, indicating degenerative disc disease at L3, L4 and L5; and (3) Grade 1 spondylolisthesis at L4. (Id. at 322.) Plaintiff reported having 4 days of acute midthoracic back pain to the right of his spine in the T11-12 area, which he described as severe and burning and rated as a pain level of 9 out 10. (Id. at 335.) He described the pain as being typical of other flareups. (Id.) Dr. Kundu found reduced flexion/extension and localized tenderness at the T11-12 area. (Id.) The doctor observed plaintiff had two areas of concern with respect to his back: lower back pain with asymptomatic Grade 1 spondylolisthesis; and acute thoracic spinal pain consistent with back strain. (Id. at 336.) Plaintiff was prescribed Mobic and Robaxin and directed to treat his back with moist heat. (Id.) An additional x-ray was conducted on October 17, 2014, which showed degenerative disc disease from approximately T6-T9, with disc narrowing and degenerative changes in this area. (Id. at 320.)

On November 20, 2014, plaintiff was seen at the Family Health Centers by Dr. Santoyo. (Id. at 338-340, 501-503.) Notes of this visit indicate the subject of the visit was

primarily hypertension. (Id.) No back problems were reported at the time. On January 7, 2015, plaintiff returned to Dr. Kundu. (Id. at 341-342) Dr. Kundu observed plaintiff's appearance to be well. (Id. at 341.) The subject of that visit was his anxiety. He had been taking Celexa for two months and reported feeling angry and irritable, which were the same side effects he experienced when taking Zoloft. (Id.) Dr. Kundu directed him to taper off Celexa and ordered a trial for Atarax. (Id.) No back problems were reported or observed during this visit.

On January 19, 2015, plaintiff was seen by Monica Farfan, a registered dietitian, for help with his hypertension, hyperlipidemia and weight management. (Id. at 344-345.) On February 26, 2015, he had an appointment with Dr. Kundu, but left without being seen. (Id. at 493-494.)

## 2. Physical Therapy Sessions (January - June 2015)

Plaintiff underwent his first series of physical therapy sessions through Family Health Centers from January to June 2015. (Id. at 355-357, 359-366, 370-372, 437-464, 469-492, 506-513.) On February 10, 2015, he reported increased pain in his lower back, which he reported he had strained while renovating a kitchen. (Id. at 480.) At the February 13 and 19, 2015 sessions, he reported some improvement but was still working on the kitchen renovation, which aggravated his lower back pain. (Id. at 483, 486) The stiffness and lower back pain continued in February, March, April, and May of 2015, although plaintiff showed continued steady progress towards improvement. (Id. at 420, 440-441, 442-443, 448-462.)

On April 7, 2015, it was noted good progress had been made, but plaintiff continued to report back pain limiting his functional capacity and decreased ability to lift/carry weight due to pain. (Id. at 361.) Plaintiff also failed to meet certain goals such as ability to lift and carry 20 pounds or have the ability to return to work, full duty, without restrictions. (Id. at 359.) It was recommended he continue physical therapy for another four weeks to address pain, work limitations, and postural deficits. (Id. at 361.) On June 4, 2015, plaintiff noted increased pain in the mid-back area, which he rated as 6 out of 10. (Id. at 507.)

On June 17, 2015, plaintiff was seen for physical therapy reassessment and treatment, by which time he had attended a total of 23 sessions at a frequency of twice a week. (Id. at 355-357.) He reported minimal to no lower back pain, but had aggravated pain, which he rated as 7 out of 10, in the upper thoracic area after moving a piece of heavy furniture. (Id. at 355.) The physical therapist recommended plaintiff be discharged from physical therapy because all treatment goals for his lower back problems had been met, and that he be referred to a chiropractor and/or a pain management specialist for treatment of the thoracic area. (Id. at 356-357.)

### 3. P.A. Martini Murialdo and Dr. Sally Alassil (June - November 2015)

On June 9, 2015, plaintiff saw Physician Assistant ("P.A.") Murialdo for a physical. (Id. at 465-468.) The symptoms which prompted that visit were an intermittent cough, depression, insomnia and back pain. (Id.) With respect to his mental health, plaintiff reported he was sometimes stressed and anxious due to responsibilities at home. (Id. at 465.) He was mildly depressed and said he did not like leaving his home. (Id.) He was not interested in counseling, but said he would try Amitryiptyline. (Id. at 465-466.) P.A. Murialdo noted the physical therapist's recommendation that plaintiff try chiropractic treatment and/or be referred to pain management but, because his insurance denied coverage for chiropractic treatment, she made a pain management referral. (Id. at 466.) On November 18, 2015, plaintiff was seen by Dr. Alassil to review lab results. (Id. at 435-436.) He did not report any back pain at that time.

### H. Hussein Abdulhadi, M.D., Treating Pain Management Specialist

Plaintiff saw Dr. Abdulhadi on January 9, 2016. (Id. at 367.) During this visit, plaintiff reported having lower back, leg and thoracic pain, which he rated as mild when resting and severe with physical activity. (Id.) Dr. Abdulhadi found lumbosacral tenderness, SLR, and thoracic tenderness and assessed plaintiff with: (1) degenerative disc disease; (2) Listhesis of L4-L5; (3) Stenosis back pain; (4) sciatica 2 degrees above; and (5) degenerative disc disease of thoracic pain/mid thoracic. (Id.) Dr. Abdulhadi noted

plaintiff was unable to do activities of daily life and physical therapy due to pain and prescribed Tramadol and Neurontin. (Id.)

### I. Family Health Centers of San Diego (February – July 2016)

#### 1. Dr. Alassil and P.A. Randall Culler (February – May 2016)

Plaintiff met with Dr. Allassil on February 18, 2016, at which time the doctor addressed plaintiff's hypertension and chronic pain. (Id. at 432-434.) With respect to his back issues, the doctor reported increased muscle tension over the upper back, lower back, and cervical paraspinal muscles and point tenderness to palpation over scapulae. (Id. at 433.) Plaintiff reported Tramadol was not helping with his back pain, and it was noted his insurance had twice denied coverage for an epidural injection. (Id.)

On March 28, 2016, plaintiff returned to Family Health Centers after having been treated at the Grossmont Hospital Emergency Room on March 25, 2016, for pain in his left leg.[3] (Id. at 373-375.)  He was seen by P.A. Culler, who noted that plaintiff reported having low back pain and burning down his left leg for about 3 months, but was experiencing very minimal pain that day. (Id. at 373.) He also noted decreased range of motion in forward and side flexion. (Id. at 374.)  PA Culler ordered an MRI of the lumbar spine, referred plaintiff for an orthopedic evaluation and for follow up with pain management. (Id.) The MRI, which was conducted on April 29, 2016, showed pars defects of L4 with grade I anterolisthesis and subsequent severe bilateral foraminal narrowing with L4 nerve root impingement, but no spinal stenosis. (Id. at 376-377.)

On April 13, 2016, plaintiff returned to see Dr. Alassil regarding his hypertension and back pain. (Id. at 429-431.) He reported the physical therapy he did in 2015 yielded minimal improvement to his lower back pain and again reported that taking Tramadol for

---

[3]     Records of plaintiff's treatment at Grossmont Hospital on March 25, 2016, are not part of the Administrative Record.

pain management did not help. (Id. at 429.) Treatment notes from this visit indicate plaintiff went to the emergency room for excruciating back pain a few weeks earlier.[4] (Id.) He reported he was prescribed a Medrol dose pack, which alleviated his pain for about a week, but it had since returned. (Id.) At the time of this visit, he was suffering lower back pain and reported left lower back burning pain. (Id.) He also noted occasional left foot weakness and numbness. (Id.) The doctor observed an increase in muscle tension over plaintiff's lower back and ordered an MRI and orthopedic evaluation. (Id. at 429-430.)

On May 18, 2016, Dr. Alassil met with plaintiff again. (Id. at 426-428.) With respect to his back issues, she noted he was scheduled for an orthopedic evaluation on June 8, 2016. (Id.) He had started physical therapy a few days prior and she advised him to continue with this course of treatment. (Id.)

### 2. Physical Therapy Sessions (May - July 2016)

Plaintiff underwent a second round of physical therapy from May to July of 2016. (Id. at 417-425, 542-550, 561-565.) At his first visit on May 20, 2016, he was observed to have an antalgic guarded gait. (Id. at 423.) He said he was not having radiating symptoms into his lower extremities because he had not been standing. (Id.) He reported he had started a new job that was more physical than expected. (Id.) On May 23, 2016, he reported some stiffness in his lower back. (Id. at 420.) On May 25, 2016, the pain and stiffness in his lower back had lessened. (Id. at 417.) On June 14, 2016, he reported increased pain since his last visit and said he had been lifting and carrying heavy furniture. (Id. at 549.) He skipped the following visit because he was in too much pain after lifting and carrying heavy counters at the flower shop where he worked. (Id. at 547.) On June 22, 2016, his pain level was low. (Id.) On June 29, 2016, he described a general increase in back pain due to lifting and moving objects at work, but his pain was not bad at that time because he had not been on his feet long. (Id. at 545.) He missed his next appointment because he had the flu;

---

[4]     There are no records of an emergency room visit in the Administrative Record.

however, he reported that he still worked and built a retaining wall. (Id. at 542.) On July 22, 2016, it was observed that his pain was more localized, and he rated it as a 5 out of 10. (Id. at 563-564.) He was advised to decrease the intensity of his activities and to take a week off of work, which was noted to be an aggravating factor for his back problems. (Id.) At his last visit on July 28, 2016, he reported his leg pain had improved and he had no significant pain in his lower back. (Id. at 561-562.)

### J. Tara M. Kelly, Nurse Practitioner, UCSD Health

On June 8, 2016, plaintiff was seen by Nurse Practitioner ("N.P.") Kelly for an orthopedic surgery referral. (Id. at 534-37) He reported low back pain into his left buttocks and down his left leg, as well as numbness on the medial foot and lower leg. (Id. at 534.) An MRI of his lumbar spine revealed: (1) degenerative disc disease at L1-L4 without any central or foraminal stenosis; (2) pars defect at L4-L5 with severe bilateral foraminal narrowing; (3) grade 1 anterolisthesis; and (4) disc bulge at L5-S1. (Id. at 536.) N.P. Kelly noted plaintiff appeared oriented, had good coordination and gait and did not need assistive devices. (Id.) She further noted normal results regarding the following tests: lumbar spine, range of motion, motor strength, deep tendon reflexes and straight leg raising. (Id.) N.P. Kelly further assessed him as having midline low back pain with left-sided sciatica, anterolisthesis and spinal stenosis. (Id.) She concluded that plaintiff was not a current candidate for surgery because he had not exhausted non-operative pain management options. (Id.) It was recommended that he use Lumbar ESI since he still had pain despite physical therapy and medication. (Id.) Referral to pain management was also recommended. (Id.)

### K. Family Health Centers of San Diego (July - September 2016)

On July 29, 2016, plaintiff was seen by Dr. Alassil to follow-up on his cough and back issues. (Id. at 555-557.) Noting he was not a candidate for surgery, she referred him for pain management. (Id.)

On August 30, 2016, plaintiff was seen by Internal Resident Najwan Al Ani for lower and upper back pain, which he reported had increased over the last few months due

12

to heavy lifting, and was worse when standing and walking. (Id. at 551-553.) He also had a foot injury he incurred two weeks prior while playing sports. (Id. at 551.) He had just completed twelve physical therapy sessions. (Id.) Resident Al Ani identified trigger points over plaintiff's upper back and paraspinal muscle spasms. (Id. at 552.) Plaintiff's gait was noted to be normal, his strength was 5/5 in all extremities, he had full range of motion on both sides, and he was able to change position from standing, sitting and onto the exam table without evidence of pain or hesitation. (Id.) She recommended plaintiff schedule another appointment for trigger point injections and deferred pain medication, noting plaintiff had an appointment to see a new pain management specialist on September 14, 2016. (Id. at 551-552.)

On September 9, 2016, plaintiff was seen by Internal Resident Phillip So for trigger point injections to treat his back pain. (Id. at 540-541.) Plaintiff reported relief after getting the injections. (Id. at 541.) He was advised he may need to repeat the trigger point injections for full relief and that he should return for more injections as needed. (Id.) He was also encouraged to continue physical therapy and strengthening exercises. (Id.)

### L. Deborah Birnbaum, M.D., Treating Psychiatry Specialist

On July 22, 2016 plaintiff visited Dr. Birnbaum for evaluation and treatment. (Id. at 558-60.) Plaintiff reported he was "doing well" since discontinuing Effexor, and that he wanted to continue with taking Xanax and Trazodone. (Id. at 558-559.) He reported he still had occasional panic attacks, but felt very stable overall. (Id. at 558.) Dr. Birnbaum refilled his Xanax and Trazodone prescriptions and directed him to return for follow-up in three months. (Id. at 559.)

### M. Thomas J. Sabourin, M.D., Consultative Examining Orthopedic Surgeon

On September 24, 2016, plaintiff visited Dr. Sabourin for an orthopedic consultation examination. (Id. at 569-574.) Dr. Sabourin examined plaintiff but did not look at any x-rays or medical records. (Id. at 573.)

At that time, plaintiff reported that when he had back pain, it was worse in the mid-back than his lower back. (Id. at 569.) He told Dr. Sabourin that he first injured his back

playing baseball when he was 17; in 1980 he reinjured it in a car accident; and in March 2014, while at work as a cabinet refinisher, he injured it again. (Id.) He reported that two months prior he injured his left foot while playing frisbee. (Id.) He has had physical therapy for his back problems and has seen a pain management doctor. (Id.) One month prior to his visit, he was placed on Percocet but it had not helped. (Id.) He last worked on September 27, 2016, doing flower deliveries, but stopped when he became homeless. (Id. at 570.)

Dr. Sabourin's examination notes indicate plaintiff sat and stood with normal posture and demonstrated no evidence of any tilt or list. (Id. at 571.) Plaintiff sat comfortably throughout the examination, was able to rise from a chair without difficulty, and had no difficulty getting on and off the examination table. (Id.) Station and gait were satisfactory and toe and heel walking was normal, although plaintiff complained of some pain in the left metatarsal area where he had recently injured himself. (Id.)

Dr. Sabourin observed no issues with respect to plaintiff's cervical spine. (Id.) With regard to the lumbar area, he noted an apparent apex left lumbar scoliosis, but minimal to none in the thoracic or cervical areas. (Id.) Plaintiff had minimal pain in the mid back with forward flexion and tenderness over the T8 spinous process. (Id.) There was no spasm, swelling or heat. (Id.) His range of motion was normal in all respects. (Id.)

When examining plaintiff's extremities, the doctor observed he had grossly normal and painless range of motion in his shoulders, elbows, wrists, hands and fingers, hips, knees and ankles and satisfactory range of motion as to his toes. (Id. at 571-572.) The neurological exam indicated normal motor strength and sensation to light touch and pinprick throughout the upper and lower extremities on both sides. (Id.) Deep tendon reflexes were also normal. (Id.)

Dr. Sabourin's impression was that plaintiff had chronic thoracic and lumbar strain and sprain and mild scoliosis, apex left lumbar. (Id. at 572-573.) He opined that plaintiff: (1) could lift and carry 50 pounds occasionally and 25 frequently; (2) could stand and walk 6 hours of 8-hour workday and the same for sitting; (3) could push, pull, lift and carry; (4) could climb, stoop, kneel, and crouch frequently; (5) had no manipulative limitations; and

(6) had no need for assistive devices. (Id.) He further opined plaintiff could stand and walk for up to 2 hours at a time and sit for up to 6 hours at a time without interruption. (Id. at 576.) He placed no limitation on plaintiff's ability to use his hands and feet, including overhead reaching motion. (Id. at 577.)

### N. Douglas Engelhorn, M.D., Consultative Examining Psychiatric Specialist

On November 16, 2016, plaintiff visited Dr. Engelhorn for a psychiatric consultation. (Id. at 585-588.) Dr. Engelhorn's diagnostic impressions were that plaintiff had a recurrent type of major depression [a mild form] and panic disorder with agoraphobia. (Id. at 587.) He also noted no real mental limitations from this impression. (Id. at 589-90.) The doctor noted that plaintiff's physical issues, mainly chronic pain, predominate. (Id. at 589.)

## III. THIRD-PARTY FUNCTION REPORT

Plaintiff's mother, Gloria Barker, completed a function report on August 8, 2014. (Id. at 222-230.) She reported plaintiff's back pain limits his activities because lifting and standing is painful. (Id. at 222.) She also reported stress seems to be a big limiting factor because it affects him going to the store and being around other people. (Id.) Ms. Barker reported that plaintiff tends to get very agitated at his parents and that he does not attend social functions unless it is with other family members. (Id. at 227.) She also noted that he cannot handle stress or change of routine at all. (Id. at 228.) Medication seems to make him more anxious and stressed. (Id. at 229.)

With respect to plaintiff's daily activities, Ms. Barker stated most days plaintiff watches television, gets on the computer and helps or prepares meals if she is unable to do so. (Id. at 223). Plaintiff cares for both her and his father, as well as a pet that he sometimes feeds or walks. (Id.) Prior to his disability plaintiff was able to cook meals and do yard work, however, they buy more prepared food now and he can no longer do yard work due to his back. (Id. at 223 & 225.) He does his own laundry and vacuums, but only when his mother asks him. (Id.) Ms. Barker noted there has been no change in plaintiff's ability to do his hobbies and interests, such as watching TV or reading. (Id. at 226.) He has difficulty

putting on shoes and socks, getting out of shower/bathtub enclosure and standing when showering. (Id.) She also noted that plaintiff's condition affects his sleep as he is unable to rest at bedtime and has a hard time sleeping. (Id.)

With respect to plaintiff's abilities, his mother stated his condition affects his ability to lift, walk, bend, stand, reach, talk, climb stairs, concentrate, and get along with others. (Id. at 227.) She further noted he can only stand for 15 minutes without needing at least a 5 minute rest. (Id. at 228.)

## IV. THE ADMINISTRATIVE HEARING

The Administrative Hearing was held on September 12, 2016, at which time plaintiff and vocational expert Mark Remas offered testimony.

### A. Plaintiff

Plaintiff testified regarding his activities of daily life and his past work, briefly touching upon his medical visits and alleged disabilities (Id. at 41-64.) At the time of the hearing, he was 57 and had been working part-time as a flower delivery driver since May 2016. (Id. at 43-44.) He worked 0 to 12 hours per week and made about $2.50 per delivery. (Id. at 44) Before that he had not worked since March 2014, when he was employed as a cabinet refinisher. (Id.) From 2007 to 2012, he worked for his then-wife's home improvement business as a handyman. (Id. at 46.) In 2000, he worked as a cook at Brian Head Resort in Utah. (Id. at 45.)

Since he separated from his wife he has lived with his parents. (Id. at 47.) He used to provide caregiving services and do housework for them, but is unable to now due to his back problems. (Id.) He no longer vacuums or does laundry. (Id. at 60.) He recently vacuumed and afterwards had to lay down the entire next day. (Id. at 47.) He can only stand or walk for about 15-20 minutes before needing to rest; he no longer cooks or walks the dog. (Id. at 48-49.) Plaintiff reported that when he used to walk the dog he would also throw a ball or stick and the next day he would be stiff, hurting, and in pain. (Id. at 62.) If he cooks for his parents, he has to take breaks and lie down because standing for more than 15-20 minutes is too painful. (Id. at 49.) He has also has difficulty showering. (Id. at 60.)

Elaborating on his limitations, plaintiff stated that he cannot walk around the home more than 5 minutes before the pain starts, but he will continue walking through the pain for up to 20 minutes before he has to rest, at which point he must rest for about 30 minutes before he can start walking again. (Id. at 57.) He can carry a bouquet of flowers or 5 pounds without any problems. (Id. at 58.) He estimated he can sit for 20 to 30 minutes before having any problems and after that he has to lie down to rest. (Id. at 59.)

Plaintiff stated that physical therapy has not helped him. (Id. at 55.) He said the most effective way to alleviate his back pain is to lie down. (Id. at 56.) He estimated that in an 8 hour day he has to lay down for about 7 hours. (Id.) Lastly, plaintiff noted that he would rather have Cortisone injections than surgery, due to the risks associated with surgery. (Id. at 64.)

As for his anxiety, plaintiff reported that he is not sure what triggers it but things like driving on the freeway or his pain can. (Id.) He also stated that it is too stressful for him to go shopping and he only goes if it will be a quick trip. (Id. at 49.) His anxiety causes him to throw up every morning. (Id. at 62.) He further noted that some of the medication he took helped him, but only for about three weeks to a month. (Id. at 63.)

**B. Vocational Expert**

Vocational expert Mark Remas testified that an individual like plaintiff, who was capable of light work, frequent postural activities, occasional stooping and crouching, could return to his previous work as a short order cook. (Id. at 66.) This individual would also be able to work as a fast food worker, lunch room or coffee shop counter attendant or bench assembler. (Id.) An individual with plaintiff's work history would be precluded from his past work if he was only capable of sedentary work. (Id.)

**V.   THE ALJ'S DECISION**

After considering the record, the ALJ made the following relevant findings:

….

3:18-CV-01624-LAB(KSC)

**2. The claimant has the following severe impairments: lumbar and thoracic degenerative disc disease and chronic lumbar and thoracic strains and sprains (20 CFR 416.920(c)).**

The above medically determinable impairment(s) significantly limits the ability to perform basic work activities as required by SSRs 85-28 and 96-3p. The impairments above are severe because they are medically determinable impairments diagnosed by the treating and examining physicians. Moreover, they cause more than a minimal effect on his ability to do basic work activities. They have lasted for a continuous period of at least 12 months. The medical evidence record supports this finding (Ex. 17F/7).

The claimant's remote fracture of right shoulder, childhood surgery of the foot, and sprain of left toes are non-severe impairments because they do not cause more than a minimal effect on his ability to perform basic work related activities or they have not lasted, or are expected to last, a continuous period of 12 months. The vast majority of the sparse medical evidence record, approximately 310 pages, is regarding the claimant's alleged back impairment though the medical evidence record as a whole documents his condition but shows a history of conservative, routine treatment and many normal and mild exam findings (Exs. 1F-18F, Infra).

The claimant's medically determinable mental impairments of affective disorder and anxiety, considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore non-severe.

In making this finding, the undersigned has considered the four broad areas of mental functioning set out in the disability regulations for evaluating mental disorders and in the Listing of impairments (20 CFR, Part 404, Subpart P, Appendix 1). These four areas of mental functioning are known as the "paragraph B" criteria.

The first functional area is understanding, remembering, or applying information. In this area, the claimant has mild limitation. The next functional area is interacting with others. In this area, the claimant has mild limitation. The third functional area is concentrating, persisting, or maintaining pace. In this area, the claimant has mild limitation. The fourth functional area is adapting or managing oneself. In this area, the claimant has mild limitation.

There is substantial evidence that supports this finding. [footnote omitted] For example, the opinions of the independent psychiatric consultative examiners and the DDS psychiatric and psychological consultants and the medical evidence record support this finding.

The independent psychiatric consultative examiners and the DDS psychiatric and psychological consultants opined the claimant's mental condition is non-severe (Exs. 4F/4, 18F/6, 7-9, 2A/7, 4A/6-7). The undersigned gives these opinions significant weight because they examined the claimant and reviewed the claimant's records, they are familiar with the Social Security Administration's precise disability guidelines, and their opinions are consistent with the medical evidence record as a whole, which shows normal Mental Status Examination findings and little treatment.

Throughout the medical evidence record there are many Mental Status Examination findings that are normal (Exs. 4F/5, 18F/5, 1 F/7, 10, l0F/ 12-13, 15-16, 20-21, 23-24, 25-26, 31-32, 13F/4, 16F/21-22). For example, the September 2014 independent psychiatric consultative examiner Ramin Shahla, M.D. reported the claimant's posture, gait, and mannerisms were within normal range. He displayed pain behavior in regard to his back pain. He was well dressed and groomed with good hygiene. He was polite, respectful, and cooperative. He put forth good effort into the evaluation. In general, his speech was well organized and did not require redirection. His speech was normal in rate, volume, and tone. This evaluator could understand 100% of his verbalizations. His psychomotor activity was within normal limits. He had good eye contact. He was oriented to time, place, person, and situation. He knew that the interview was for a psychiatric evaluation for Social Security Disability. He remembered 3 of 3 objects immediately and 3 of 3 objects in delayed recall. He was able to complete serial threes. He was able to follow a three-step command. He displayed good attention and concentration. When asked about similarities between an apple and an orange, he stated, "Fruit." When asked what he would do if there was a fire, he replied that he would leave. His mood at this time appears dysthymic. This evaluator observed his affect as being constricted. His thought processes were goal-directed. He denied delusions or hallucinations. (Ex. 4F/5).

The claimant reported to September 2014 independent psychiatric consultative examiner Dr. Shahla that he denies having a history of psychiatric hospitalization. Currently, the claimant is not receiving mental

health services. The claimant's family psychiatric history is unremarkable for mental illness. No history of suicidal or homicidal ideation. No history of mania, delusions, or hallucinations. No history of being on psychotropic medications. (Ex. 4F/3).

The November 23, 2016 independent psychiatric consultative examiner H. Douglas Engelhom, M.D. noted many normal Mental Status Examination findings.  The Mental status examination reveals an alert, cooperative, white male appearing his stated age of 57 wears his hair ponytail. He is adequately dressed and groomed and is probably of average intelligence. His speech is normal and there are no unusual mannerisms noted.  He actually appears to be in good physical health.  He is fully ambulatory without assistance and does not appear to be in any physical distress. He easily gets from a sitting to standing position. He walks without assistance.  His thinking is logical, and he makes good eye contact.  There is no evidence or psychosis. There is no evidence of active depression. He was not noted to be at all tearful, sad or emotional. He seems to harbor some resentment toward his parents because they asked him to move out of their home.  There is no evidence or excessive levels or anxiety. He appears to make an honest presentation.  He is an adequate historian.  His sensorium is clear, and he is fully oriented. There is no cognitive impairment. He could give me the exact date as well as the day of the week. He could correctly identify the current season or the year. He could name his city and state of residence.  He could give me his address, telephone number, Social Security number and date of birth.  He could name the current president of the United States as well as the most recent ex- president.  He could name the capital city of this country. He could name the governor of California and the state capital.  His concentration and attention were adequate as judged by accurate and rapid responses to serial sevens.  His insight and judgment seemed fully intact, although not formally tested. There is no evidence or psychomotor retardation, flat affect, loosening of associations, delusions or hallucinations. (Ex. 18F/5).  Dr. Engelhom also notes that the claimant continues to occasionally use marijuana, which he has been using since high school (Ex. 18F/6).

There is also no evidence of extended hospitalizations, a structured environment or an assisted care arrangement (Exs. 4F/3, 18F/4, 1F-18F).

In addition, the record shows that the claimant engages in many activities of daily living (ADLs), further demonstrating he has no more than mild limits. For example, the September 2014 independent psychiatric consultative

20

examiner Dr. Shahla reported the claimant's typical daily activities include the claimant gets up, watches TV, does some light housework, prepares dinner, and watches TV in bed. He takes care of his mother who has Alzheimer's. He also reports that he is painting his parent's house. He can take care of chores such as vacuuming, laundry, cooking, shopping, and doing yard work. The claimant reports enjoying reading, hiking, fishing, and walking the dog. There is no anhedonia; i.e., there is no inability to feel pleasure. The claimant is able to drive. The claimant handles his own funds. It is also noted that he lives with his parents and he drove to the consultative examiner appointment (Ex. 4F/5, 3).

The November 2016 independent psychiatric consultative examiner Dr. Engelhorn reported the claimant lived with his parents for several years and provided general services to them. He has recently been living in Fontana, California in a camper shell because his parents apparently asked him to leave their home (Ex. 18F/6).

The November 2016 independent psychiatric consultative examiner Dr. Engelhorn reported the claimant engages in many ADLs. He is currently living in a camper shell located in Fontana, California. He has been living in this camper shell for about two months. However, he continues to visit his parents with regularity. He was living with his parents for the greater part of the past three years. He states that he is allowed to use the house where his camper shell is located in Fontana. He uses the bathroom, kitchen and laundry facilities. He drives a car and occasionally attends church services. He has no outside social life or close friends. He frequently watches television and enjoys reading. He has access to a home computer. As noted previously, he frequently drives down from Fontana to Santee to visit his parents as much as once or twice each week (Ex. 18F/4-5). He continues to spend considerable time with his parents here in the Santee area. He has four siblings and has contact with all of them. (Ex. 18F/3).

Furthermore, the claimant indicates in a function report dated August 2014 that he lives in a house with family. On a daily basis, he gets dressed, has coffee and watches television or reads, helps his elderly parents, makes dinner, reads or watches television, and goes to bed. He shops and cooks for his parents. He also feeds and walks the dog. He has no problems with personal care (e.g. dressing, bathing, caring for hair, feeding self, using the toilet) except physical issues. He prepares meals daily such as sandwiches, dinners, and complete meals. He does chores, such as laundry, light housework and light yard work. He goes outside. He travels by driving,

walking, riding in a car, and riding a bicycle. He is able to go out alone. He shops in stores for groceries and books. He is able to handle finances, like paying bills, counting change, handling a savings account, and using a checkbook/money orders. His ability to handle money has not changed since his conditions began. In addition to reading and watching television, he uses Facebook daily. He also spends time with others, using Facebook and going to church. He also attends church regularly. He does not need reminders to take care of personal needs, take medicine, or go places. He does not have any problems getting along with family, friends, neighbors or others except he notes that he gets irritated and he does not like to go to parties unless it is with family. He gets along well with authority figures. He has never been fired or laid off from a job because of problems getting along with other people. He can pay attention as long as needed. He finishes what he starts (e.g. a conversation, chores, reading, watching a movie.) He does very well at following written and spoken instructions (Exs. 4E/6-14).

In addition, in a disability report dated March 5, 2015, when asked what changes have occurred in his daily activities since he last completed a disability he report, he states he has "been remodeling a kitchen." (Ex. 9E/4-5).

Because the claimant's medically determinable mental impairments cause no more than "mild" limitation in any of the functional areas, they are non-severe (20 CPR 416.920a(d)(l)).

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p). Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

**3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1(20 CFR 416.920(d), 416.925 and 416.926).**

The undersigned considered the applicable listings, including 1.04, 1.02, and 11.14, but the medical evidence record does not demonstrate that his conditions are listing level. There is substantial evidence in the medical evidence record that supports this finding. For example, there is no medical expert, or treating or examining physician, who opines that the claimant's conditions, singly or in combination, are listing level. As discussed below, the medical evidence record also supports this finding (Exs. 1F-18F, *Infra*).

4. **After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of medium work as defined in 20 CFR 416.967(c).**

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CPR 416.929 and SSR 96-4p. The undersigned has also considered opinion evidence in accordance with the requirements of 20 CPR 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functional limitations. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities.

As discussed within, the medical evidence record documents the claimant's condition but shows a history of conservative, routine treatment and many physical and mental exam findings that are normal *(Supra, Infra)*. Moreover, there are many ADLs, including taking care of his mother who has

Alzheimer's, painting his parent's house, remodeling a kitchen, handling finances, light housework, vacuuming, laundry, cooking, shopping, and doing yard work, and reading, hiking, fishing, and walking the dog, that further contradicts his allegations and demonstrates his ability to work *(Supra, Infra)*.

Despite the many normal exam findings and numerous ADLs, the claimant alleges in his July 16, 2014 Supplemental Security Income application that he is disabled and unable to work as of March 23, 2014, due to the following: back problem and anxiety disorder. The claimant reports that his conditions affect the following abilities: lifting, bending, standing, reaching, walking, sitting, talking, memory, concentration, and getting along with others. He cannot lift heavy things. His back gets stiff when he sits. His back problem makes it hard to stand for long periods. His anxiety affects talking, concentration, and getting along with others. He can walk 15 minutes before needing to stop and rest for five minutes before resuming walking. He gets irritated with family. He does not like to go to parties unless it is with family. He has a hard time talking to people face-to-face and meeting new people. He gets really nervous in interviews and cannot concentrate. He has a hard time being around people. He cannot handle crowds. He also does not handle stress or changes in routine well. He loses his complete train of thought, and sometimes breaks down and cries. In a subsequent disability report, he indicates there has not been a change in his condition. Regarding his ability to care for his personal needs, he cannot be in crowds. He does not eat or he eats only a small meal a day. Raising his arms above his head hurts his back. He has a hard time sleeping. The pain wakes him up when he turns over. It is hard to put on socks and shoes. He is "still absolutely disabled." In a subsequent disability report, he indicates there has not been a change in his condition except he has "no patience with anything." Regarding his ability to care for his personal needs, he shaves once or twice a month. He does not prepare meals every night. He cleans his room. He misses church. He forgets things. If he goes shopping, he cannot remember what he needs. When asked what changes have occurred in his daily activities since he last completed a disability report, he states he has "been remodeling a kitchen." He attends therapy counseling and pain management. The claimant testified that he is unable to work due to his back issue. He described one time where he strained his back while pushing a vacuum and it required injections. The doctors have time him he has a pinched nerve in his sciatic muscle down to his leg. The doctors want him to take drugs but he does not want to take them. He can only stand for 15 to 20

minutes then he has to lay down because he is in so much pain. He has had back problems most of his life but his condition has gotten worse, especially the last two and a half years. He occasionally grocery shops for his parents but he has too much difficulty because it is too stressful. He testified he drove to the hearing and parked on the sixth floor of the parking structure. He also testified he gets vertigo. He attended physical therapy, going once a week for about 24 weeks and then did another 12 week period of physical therapy, but it did not help. The pain goes from between his shoulder blades down his sciatic nerve into his ankles. The pain in his shoulder blades is constant while the leg pain comes and goes. He can walk for about five minutes before he is in pain and 20 minutes before he cannot walk anymore, then he lies down. He has to lie down for 30 to 45 minutes before he can resume his activity. He can lift about five pounds but it hurts needs to rest. He can sit for 20 to 30 minutes before he has to lie down. Sometimes he lies on the floor. He also has anxiety and depression. His therapist has given him some relaxation tools to help with his anxiety. He takes the following medications: Darvocet (back pain), Flexeril (muscle relaxer), Galpin (anxiety), Hydrocodone (back pain), Lorazepam 0.5 mg to 1 mg daily as needed (anxiety), Norco (pain), Xanax (anxiety), Atorvastatin calcium (cholesterol), Citalopram (anxiety), Lisinopril (inflammation), Robaxin 500 mg 8tablets (back pain), Hydroxyzine 25 mg once day (anxiety), Effexor 125 mg once a day (depression) (Exs. lD/ 1, 2E/1-10, 4E/6-14, 7E/ 1- 6, 9E/1-6, 13E/ 1, 14E/ 1, 15E/ 1, 18E/3, 19E/ 1-2, Testimony).

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

Although the claimant's alleged onset date of disability (AOD) is March 23, 2014, the claimant's Title XVI claim was filed on July 16, 2014; thus, the relevant period for functional limitations is from July 16, 2014 through the present (*Supra*).

There is substantial evidence in the record that supports the residual functional capacity (RFC). For example, the opinion of the independent orthopedic consultative examiner Thomas J. Sabourin, M.D., who is a board certified orthopedic surgeon. Dr. Sabourin's opinion also undermines the claimant's allegations, including the severity of his impairments and their

limiting effects. In addition, the sparse medical evidence record, approximately 310 pages, documents his condition but shows a history of conservative, routine treatment and many normal and mild exam findings. Furthermore, there are many ADLs, including taking care of his mother who has Alzheimer's, painting his parent's house, remodeling a kitchen, handling finances, light housework, vacuuming, laundry, cooking, shopping, and doing yard work, and reading, hiking, fishing, and walking the dog, that further undermines his allegations and demonstrates his ability to work.

As far as Dr. Sabourin's opinion, Dr. Sabourin, who is a board certified orthopedic surgeon, examined the claimant in October 2016 and opined the claimant would have limits as follows: he could only lift and carry 50 pounds occasionally and 25 pounds frequently; he could stand an walk six hours of an eight-hour workday and sit for six hours of an eight-hour workday; push and pull limitations are equal to lift and carry limitations; postural limits are all frequent; he has no manipulative limitation; he has no need for assistive devices to walk; an environmental activities are unlimited except frequent exposure to extreme cold, extreme heat, and vibration, and occasional to unprotected heights (Ex. 17F/7, 9-14). The undersigned gives Dr. Sabourin's opinion significant weight because he is an independent consultative examiner, he is a board certified orthopedic surgeon, he examined the claimant, he is familiar with the Social Security Administration's precise disability guidelines, and his opinion is consistent with his exam findings, which are generally normal, and the medical evidence record as a whole, which documents his condition but shows a history of conservative, routine treatment and many normal and mild exam findings. The record also demonstrates that the claimant engages in many ADLs.

During the relevant period of July 16, 2014 (Supplemental Security Income application filing date) through the present, the sparse medical evidence record, approximately 310 pages, documents his conditions but only shows conservative, routine treatment and many normal and mild findings.

At the September 30, 2014 independent psychiatric consultative exam, the examiner Dr. Shahla noted the claimant's posture and gait were within normal limits (Ex. 4F/5).

The October 2016 independent orthopedic consultative exam revealed many exam findings that are normal, including the following. The claimant has no neurological deficit. He does have a mild scoliosis, apex, left lumbar. He is

a well-nourished male in no acute distress. He is alert and oriented as to time, place, and person. The claimant sits and stands with normal posture. There is no evidence of any tilt or list, and the claimant sits comfortably during the examination. In obtaining the upright position, the claimant rises from a chair without difficulty. Station and gait in this claimant is satisfactory. He has no assistive devices. Toe and heel walking is normal. He complains of some pain in the left metatarsal area where he had the recent injury with toe walking. He has no assistive devices with him. He has no difficulty getting on and off the examination table. (Ex. 17F/5, 7).

The October 2016 independent orthopedic consultative exam further revealed many normal musculoskeletal exam findings. The cervical spine is normal - range of motion of the cervical spine is grossly normal and painless, and there is no deformity, scar, tenderness, spasm, swelling, or warmth in the neck. Regarding the lumbar spine, he has minimal pain in the mid back with forward flexion. He does have an apparent scoliosis, apex left lumbar, but minimal to none in the thoracic or cervical areas. Scars are none. He is tender approximately over the T8 spinous process. There is no spasm, swelling, or heat. Range of motion of the lumbar spine is within normal limits except a slight decrease with extension (forward flexion is 90/90 degrees, extension is 20/25, lateral flexion is 25/25, and rotation is 30/30). Straight leg raise is negative in the supine and sitting positions. Trendelenburg test is normal. Axial load tests are normal. the upper and lower extremities are normal -there is no tenderness, warmth, crepitus, instability, or swelling and range of motion is within normal limits except some tenderness of the feet and well-healed scars along the medial border of the foot over the area of the posterior tibial tendon, navicular and first metatarsal base. Pulses are normal, 2+, throughout (Ex. 17F/5-6).

The October 2016 independent orthopedic consultative exam further revealed many normal neurological exam findings. There is normal motor strength throughout the upper and lower extremities bilaterally (5/5). There is normal sensation to light touch and pinprick in the upper and lower extremities bilaterally. Deep tendon reflexes are normal, 2+. There is no clonus, spasticity, or rigidity. Babinski and Hoffmann tests are negative (Ex. 17F/6-7).

The October 2016 independent orthopedic consultative examiner also noted the claimant drinks a six-pack of beer and a pint of liquor a week. He is a former methamphetamine user being sober for 15 years. He uses medical marijuana occasionally. The claimant drove himself to the

examination (Ex. 17F/4).

An October 1, 2014 exam reports the claimant is well-developed and appears comfortable and in no acute distress. His gait is non-antalgic; he has coordinated gait with normal heel-toe progression. The Spurling's test is negative. Babinski 's is also negative. The neurological exam findings are normal. He has subjective complaints of tenderness to palpation of the left upper back and lumbar spine. Straight leg raise is negative on the right and positive on the left. There is mild lumbar spasm. There is decreased range of motion and a positive Hawkin's of the right shoulder. The x-rays reveal degenerative disc disease with lumbar spondylosis and L4-5 spondylolisthesis. There is also a diagnosis of left shoulder subacromial impingement/ bursitis. Motor strength is normal, 5/5, throughout the upper and lower extremities. Sensation is normal. Pulses are present in the bilateral distal extremities. Deep tendon reflexes are also normal, 2+, throughout (Ex. 5F/4-5).

At the November 23, 2016 independent psychiatric consultative exam, the examiner Dr. Engelhorn noted the claimant "actually appears to be in good physical health. He is fully ambulatory without assistance and does not appear to be in any physical distress. He easily gets from a sitting to standing position. He walks without assistance" (Ex. 18F/5).

An April 5, 2014 visit notes many normal exam findings, including neurological (Ex. 7F/6).

An October 14, 2014 x-ray of the lumbar spine reports degenerative disc disease at L3, L4, and L5 and grade I spondylolisthesis (Exs. 6F/ 10, 10F/10). An x-ray of the thoracic spine shows degenerative disc disease, most marked at T6-T9 (Exs. 6F/8, 10F/11).

October 16, 2014 notes document that the claimant has "no problems with weakness/numbness" (Exs. 6F/23, 11F/83).

An October 22, 2014 visit documents that the claimant "denies weakness/numbness/tingling" (Ex. 6F/20).

A January 7, 2015 visit notes many normal exam findings, including neurological (Exs. 6F/30, 11F/89).

A January 15, 2015 visit notes many normal exam findings, including neurological (Exs. 12F/3, 13F/3). It also states the claimant denies joint pains and joint swelling. There are no musculoskeletal or neurological issues noted (Exs. 12F/2-3, 13F/2-3).

Notes from February 10, 2015 indicate the claimant is working renovating a kitchen and "tweek[ed]" his back (Ex. 11F/65).

A February 13, 2015 visit reflects that the claimant reports his lower back pain has subsided since his last visit (Ex. 11F/68).

A February 19, 2015 visit reports the claimant reports his back is slightly better as he continues working on the kitchen, which aggravates his back (Ex. 11F/71).

Notes from February 23, 2015 document the claimant aggravated his back "doing some kitchen remodeling over the weekend" (Ex. 11F/74).

A February 25, 2015 visit documents the claimant "reported feeling better" (Ex. 11F/76).

On February 26, 2015, the claimant left without being seen (Ex. 11F/78).

A March 26, 2015 visit reports the claimant does not have much low back pain, but more tightness. He fell from a tree trying to cut a branch and has increased pain in his limbs, especially the left elbow (Ex. 11F/54).

Notes from March 30, 2015 state the claimant's lower back is feeling better but he has midback tightness (Ex. 11F/59).

An April 7, 2015 visit indicates the claimant reports he can lift or carry 50 pounds at waist level and more than five to 10 pounds overhead (Ex. 8F/7).

Notes from April 9, 2015 state the claimant denies depression and anxiety, and he denies joint pain and joint swelling. There are no musculoskeletal or neurological issues noted (Ex. 13F/4-5)

Physical therapy notes from May 15, 2015 state that the claimant reported his "back symptoms are feeling better, however still notes tightness" (Ex. 11F/36). The exam findings, including neurological, are normal (Ex. 11F/39).

A May 27, 2015 visit notes the claimant reports increased tightness and lower back pain "secondary to lifting and moving objects around the house" (Ex. 11F/47).

A June 4, 2015 visit notes the claimant was "moving and lifting furniture" and has an increase in mid-back pain (Ex. 11F/92).

A June 17 and 24, 2015 visits reflect that the claimant reports he has some mid back pain but his lower back pain is minimal to nil (Ex. 8F/3, 11F/22).

The June 17 [2015] notes state that the claimant has "T/S pain after moving a heavy piece of furniture over the weekend" (Ex. 8F/3).

An April 29, 2016 magnetic resonance imaging (MRI) scan of the lumbar spine shows mild degenerative disc disease, grade I anterolisthesis, and a two mm bulge at L5-S 1 with an annular tear but no central stenosis or foraminal narrowing (Exs. 10F/8-9, 15F/5).

Notes from May 20, 2016 report the claimant has a new job and it is "more physical than he expected," complaining of low back pain (Ex. 11F/8).

A June 8, 2016 visit reports normal physical and mental exam findings. His upper extremities and lower extremities have good range of motion with no significant deformities. His gait is brisk with good coordination. He does not use any assistive devices. The lumbar spine is non-tender. He can heel-to-toe walk without deficit. Sensation is intact but there is a positive Trendelenburg sign (Ex. 15F/4).

A June 22, 2016 visit states that the claimant reports that the flower shop (where he works) "moved to another building and he has had to carry heavy counters" (Ex. 16F/10).

Notes from a June 29, 2016 visit evidence that the claimant reports an "increase in back aggravation due to lifting/moving objects for work" (Ex. 16F/8).

A July 11, 2016 visit reports the claimant missed his physical therapy appointment last week but he still worked. It also notes that the claimant built a retaining wall (Ex. 16F/5).

Notes from August 30, 2016 report the claimant has been lifting heavy objects over the last few months and resulted in some back pain (Ex. 16F/14).

The August 30, 2016 visit notes motor strength is normal, 5/5, sensation is normal, deep tendon reflexes are normal, and gait is normal but there is muscle spasm. Further, the claimant is able to change position from standing, sitting, and onto the exam table without evidence of pain or hesitation (Ex. 16F/15).

An August 31, 2016 x-ray of the left foot is negative for fracture (Ex. 16F/29).

The medical evidence record reflects many normal and mild exam findings and that the claimant had physical therapy and some injections (Exs. 9F/2-3, 10F, 11F, 1F-18F). There are also some positive exam findings such as a positive straight leg raise (11F/ 15) but they are contrary to the medical evidence record as a whole.

*As for the opinion evidence, the remaining opinions are given little weight.*

*The opinion of Thomas F. Moyad, M.D. is given little weight because it is not consistent with the record as a whole, which documents his condition but shows a history of conservative, routine treatment and many normal and mild exam findings, and that the claimant engages in many ADLs.* Dr. Moyad opined the claimant would have limits as follows: lift or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk no more than six hours in an eight- hour day with normal breaks; sit six hours in an eight-hour day with normal breaks; he does not need an assistive device for short and long distances and uneven terrain; postural limitations are occasional climbing, stooping, bending, and crouching; manipulative limitations are occasional reaching with the right shoulder; and there are no visual, communicative, or environmental limitations (Ex. 5F/6).

*The DDS medical consultants J. Hartman, M.D. and A. Khong, M.D. reviewed the claimant's medical records in October 2014 and February 2015, respectively.* Dr. Hartman opined the claimant would have limits as follows: he can occasionally lift and/or carry (including upward pulling) 20 pounds and frequently lift and/or carry (including upward pulling) 10 pounds; he can stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday; he can sit (with normal breaks) for a

total of about six hours in an eight-hour workday; push and/or pull
(including operation of hand/foot controls) is unlimited, other than shown
for lift and/or carry; postural limitations are all occasional except no
climbing ladders, ropes or scaffolds; manipulative activities are unlimited
except he is limited to frequent overhead reaching with the left upper
extremity; and there are no visual, communicative, or environmental
limitations (Ex. 2A/9-10). Dr. Khong opined the claimant would have limits
as follows:  he can occasionally lift and/or carry (including upward pulling)
20 pounds and frequently lift and/or carry (including upward pulling) 10
pounds; he can stand and/or walk (with normal breaks) for a total of about
six hours in an eight-hour workday; he can sit (with normal breaks) for a
total of about six hours in an eight-hour workday; push and/or pull
(including operation of hand/foot controls) is unlimited, other than shown
for lift and/or carry; postural limitations are frequent climbing stairs or
ramps, frequent climbing ladders, ropes, or scaffolds, frequent kneeling,
occasional stooping, occasional crouching, and occasional crawling, and no
limits with  balancing; and there are no manipulative, visual,
communicative, or environmental limitations (Ex. 4A/8-9).  *The undersigned
gives these DDS medical consultants' opinions little weight because their
opinions are not consistent with the record as a whole, which documents his
condition but shows a history of conservative, routine treatment and many
normal and mild exam findings, and that the claimant engages in many
ADLs.*

The Global Assessment of Functioning (GAF) score opinions are given little
weight because they are a snapshot in time and do not accurately, reflect the
claimant's functional abilities. Moreover, they also do correlate with the
Social Security Administration' s precise disability guidelines, including the
B and C criteria of the listings or an RFC.

The opinions of disabled are given little weight because they are not
consistent with the many normal and mild exam findings and conservative,
routine treatment in the medical evidence record. Moreover, those opinions
evidence a lack of familiarity with the Social Security Administration' s
precise disability guidelines, as they do not address the listings or any
exertional or non-exertional limitations. Further, the finding of disabled is
one reserved for the Commissioner.

The only other opinion is from the claimant's mother Gloria Barker who
reports that the claimant's conditions affects lifting, bending, standing,
reaching, walking, talking, stair climbing, concentration, and getting along

with others.  He can walk for about 15 minutes before needing to stop and rest for five minutes.  He gets very agitated at his parents at times and does not go to any social functions unless it is with family. He has back pain that limits his activities where lifting and standing are painful. Stress also seems to be a factor, causing him to be unable to go in stores, shop or be around other people. At times, he has left stores due to anxiety.  He also does not handle stress or changes in routine well (Ex. 5E/5-13). *Ms. Barker's opinion is given little weight because she is not familiar with the Social Security Administration's precise disability guidelines as evidenced by her opinion, which fails to discuss any listings, including 1.04 and 1.02 and the B or C criteria of 12.04, 12.06 and 12.15.  She also has an inherent bias as the claimant's mother. There is also no indication that she is a licensed health care provider, further undermining her qualifications to offer an opinion regarding the claimant 's disability and functional limitations.  More importantly, her opinion is not consistent with the record as a whole, which documents his condition but shows a history of conservative, routine treatment and many normal and mild exam findings, and that the claimant engages in many ADLs.*

The claimant's ADLs also support the RFC finding above and undermine the claimant's allegations.  The record shows that the claimant engages in many ADLs.  For example, the September 2014 independent psychiatric consultative examiner Dr. Shahla reported the  claimant's typical daily activities include the claimant gets up, watches TV, does some light housework, prepares dinner, and watches TV in bed. He takes care of his mother who has Alzheimer's. He also reports that he is painting his parent's house. He can take care of chores such as vacuuming, laundry, cooking, shopping, and doing yard work. The claimant reports enjoying reading, hiking, fishing, and walking the dog. There is no anhedonia; i.e., there is no inability to feel pleasure. The claimant is able to drive. The claimant handles his own funds.  It is also noted that he lives with his parents and he drove to the consultative examiner appointment (Ex. 4F/5, 3).

The November 2016 independent psychiatric consultative examiner Dr. Engelhorn reported the claimant lived with his parents for several years and provided general services to them. He has recently been living in Fontana,

California in a camper shell because his parents apparently asked him to leave their home (Ex. 18F/6). [5]

The November 2016 independent psychiatric consultative examiner Dr. Engelhorn reported the claimant engages in many ADLs. He is currently living in a camper shell located in Fontana, California. He has been living in this camper shell for about two months. However, he continues to visit his parents with regularity. He was living with his parents for the greater part of the past three years. He states that he is allowed to use the house where his camper shell is located in Fontana. He uses the bathroom, kitchen and laundry facilities. He drives a car and occasionally attends church services. He has no outside social life or close friends. He frequently watches television and enjoys reading. He has access to a home computer. As noted previously, he frequently drives down from Fontana to Santee to visit his parents as much as once or twice each week (Ex. 18F/4-5). He continues to spend considerable time with his parents here in the Santee area. He has four siblings and has contact with all of them. (Ex. 18F/3).

Furthermore, the claimant indicates in a function report dated August 2014 that he lives in a house with family. On a daily basis, he gets dressed, has coffee and watches television or read helps his elderly parents, makes dinner, reads or watches television, and goes to bed. He shops and cooks for his parents. He also feeds and walks the dog. He has no problems with personal care (e.g. dressing, bathing, caring for hair, feeding self, using the toilet) except physical issue He prepares meals daily such as sandwiches, dinners, and complete meals. He does chores, such as laundry, light housework and light yard work. He goes outside. He travels by driving, walking, riding in a car, and riding a bicycle. He is able to go out alone. He shops in stores for groceries and books. He is able to handle finances, like paying bills, counting change, handling savings account, and using a checkbook/money orders. His ability to handle money has not changed since his conditions began. In addition to reading and watching television, he uses Facebook daily. He also spends time with others, using Facebook and going to church. He also attends church regularly. He does not need reminders to take care of personal needs, take medicine, or go places. He does not have any problems getting along with family, friends, neighbors or others except he notes that he gets irritated and he does not like to go to parties unless it is

---

[5] Portions of the ALJ's decision at step 4 are repetitive of his discussion at step 2, *supra*. The Court recitation of the relevant portions of the ALJ's decision is verbatim, and includes the repeated discussion points as they appear in the Administrative Record.

with family. He gets along well with authority figures. He has never been fired or laid off from a job because of problems getting along with other people. He can pay attention as long as needed. He finishes what he starts (e.g. a conversation, chores, reading, watching a movie. He does very well at following written and spoken instructions (Exs. 4E/6-14).

In addition, in a disability report dated March 5, 2015, when asked what changes have occurred in his daily activities since he last completed a disability report, he states he has "been remodeling a kitchen." (Ex. 9E/4-5).

In addition, the claimant's work history undermines the claimant's allegations, including the severity of his impairments and their limiting effects. His reported earnings show earnings of $4,767.50 in 2014, and no earnings thereafter (Exs. 4D/2-3, 3D/ 1, 2D/ 1-4).

Furthermore, the claimant indicated in his initial disability report that he stopped working as of March 22, 2014, due to his condition(s) (Ex. 2E/2).

As of November 2016 at the consultative exam, he reported, "He last worked in 2014 at which time he was working for a company that refinished Kitchen cabinets. He states that he has not worked since 2014" (Ex. 18F/4). "[F]or the majority of his life he has worked in factories, manufacturing and cabinetry work. He has not worked in any capacity since March of 2014" (Ex. 18F/6).

However, the record also indicates that, after his alleged onset date of disability (AOD) of March 23, 2014, he received unemployment insurance benefits (UIB) in the second and third quarters of 2014 and the first quarter of 2015. In order to receive UIB one certifies he is able to work and is looking for work (Ex. 5D/ 1-2, http://www.edd.ca.gov/unemployment/Eligibility.htm).

In addition, the claimant testified that he is currently working part-time, zero to 12 hours a week, delivering flowers. He makes $2.50 per delivery. He has been doing this work since May 2016. He also testified that, prior to the flower delivery job , he has not done any work since March 2014 when he was doing work as a cabinet refinisher (Testimony).

A June 22, 2016 visit states that the claimant reports that the flower shop (where he works) "moved to another building and he has had to carry heavy counters" (Ex. 16F/ 10).

Notes from a June 29, 2016 visit evidence that the claimant reports an "increase in back aggravation due to lifting/moving objects for work"(Ex. 16F/8).

A July 11, 2016 visit reports the claimant missed his physical therapy appointment last week but he still worked. It also notes that the claimant built a retaining wall (Ex. 16F/5).

The claimant also testified that he worked for his wife's home improvement work from 2007 through 2012 but states he was not paid. Since he separated from his wife, he has been taking care of his parents (Testimony).

The claimant reported to the independent consultative examiner that he worked in home improvement with his wife from 2007 through January 2013. His wife left him at that time so the business stopped. He worked in the past as a cabinet finisher. He last worked as a painter in a spray shop from November 2013 through March 2014. He stopped working because there was a pay problem as his boss was not paying him overtime. This is why he quit. He is currently looking for work online and is looking at jobs including being a caretaker, cook, etc. He reports that he completed one year of college so that he could work in a hospital, but he has a felony and has not been able to obtain a job. (Ex. 4F/3).

He also testified that the only work he did "under the table" is where he spent one week painting a friend's house (Testimony).

Overall, despite his claim of only one time he was paid "under the table," the record indicates the claimant has been working "under the table" for most of his life, not reporting income. The record also demonstrates that he misrepresented himself to the consultative examiners when he informed them he has not worked since March 2014.

Finally, the claimant's demeanor and testimony at the hearing supports the RFC and undermines the claimant's allegations, including the severity and limiting effects of his impairments. For example, at the hearing, he was lucid and responsive to questioning. His answers demonstrated good memory recall and logical thinking, as his answers were relevant and responsive. His demeanor and testimony also reflected good social interaction and concentration, persistence and pace. He was also

cooperative, voluntarily offered information, and seemed at ease with the hearing process.

In sum, the above residual functional capacity assessment is supported by the opinion Dr. Sabourin, the independent orthopedic consultative examiner who is a board certified orthopedic surgeon, the medical evidence record, the claimant's ADLs, the claimant's work history, and the claimant's demeanor and testimony at the hearing.

**5. The claimant is capable of performing past relevant work as a short order cook. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 416.965).**
. . . .

**6. The claimant has not been under a disability, as defined in the Social Security Act, since July 16, 2014, the date the application was filed (20 CFR 416.920(f)).**
. . . .

(Id. at 10-38 (emphasis added).)

## VI. STANDARD OF REVIEW

To qualify for disability benefits under the Social Security Act, an applicant must show: (1) he or she suffers from a medically determinable impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of twelve months or more; and (2) the impairment renders the applicant incapable of performing the work that he or she previously performed or any other substantially gainful employment that exists in the national economy. See 42 U.S.C. § 423(d)(1)(A), (2)(A). An applicant must meet both requirements to be "disabled." Id. Further, the applicant bears the burden of proving that he or she was either permanently disabled or subject to a condition which became so severe as to disable the applicant prior to the date upon which his or her disability insured status expired. Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995).

### A. Sequential Evaluation of Impairments

The Social Security Regulations outline a five-step process to determine whether an applicant is "disabled." The five steps are: (1) whether the claimant is presently working

in any substantial gainful activity. If so, the claimant is not disabled. If not, the evaluation proceeds to step two; (2) whether the claimant's impairment is severe. If not, the claimant is not disabled. If so, the evaluation proceeds to step three; (3) whether the impairment meets or equals a specific impairment listed in the Listing of Impairments. If so, the claimant is disabled. If not, the evaluation proceeds to step four; (4) whether the claimant is able to do any work he has done in the past. If so, the claimant is not disabled. If not, the evaluation continues to step five; (5) whether the claimant is able to do any other work. If not, the claimant is disabled. Conversely, if the Commissioner can establish there are a significant number of jobs in the national economy that the claimant can do, the claimant is not disabled. 20 C.F.R. § 404.1520; see also Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

### B. Judicial Review

Sections 205(g) and 1631(c)(3) of the Social Security Act allow unsuccessful applicants to seek judicial review of the Commissioner's final agency decision. 42 U.S.C.A. §§ 405(g), 1383(c)(3). The scope of judicial review is limited. The Commissioner's final decision should not be disturbed unless the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole. Schneider v. Comm'r of Soc. Sec. Admin., 223 F.3d 968, 973 (9th Cir. 2000). Substantial evidence means "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995); See also Richardson v. Perales, 402 U.S. 389 (1971) (substantial evidence is "such relevant evidence as a reasonable mind would accept as adequate to support a conclusion.") The possibility of drawing more than one inconsistent conclusion or rational interpretation from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008).

The Court must consider the record as a whole, weighing both the evidence that supports and detracts from the ALJ's conclusion. See Mayes v. Massanari, 276 F.3d 453,

459 (9th Cir. 2001); <u>Desrosiers v. Sec'y of Health & Human Servs.</u>, 846 F.2d 573, 576 (9th Cir. 1988). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." <u>Vasquez v. Astrue</u>, 572 F.3d 586, 591 (9th Cir. 2009) (citing <u>Andrews</u>, 53 F.3d at 1039). Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed. <u>Vasquez</u>, 572 F.3d at 591 (citation and quotations omitted).

Section 405(g) permits this Court to enter a judgment affirming, modifying, or reversing the Commissioner's decision. 42 U.S.C.A. § 405(g). The matter may also be remanded to the Social Security Administration for further proceedings. <u>Id.</u>

## VII.  DISCUSSION

Plaintiff contends that the RFC assigned by the ALJ is not supported by substantial evidence because he failed to properly analyze and weigh opinion evidence. Specifically, plaintiff argues that the ALJ improperly afforded "little weight" to the opinions of Dr. Moyad, the State Agency consultants, and plaintiff's mother, and improperly relied solely on the opinions of Dr. Sabourin, "who did not review any imagery and only examined plaintiff one time." (Doc. No. 17, pp. 10-11.)

### A. The ALJ's Weighing of the Opinions of Dr. Moyad, State Agency Consultants Dr. Khong and Dr. Hartman, and Dr. Sabourin is Supported by Substantial Evidence.

Plaintiff argues the ALJ failed to properly analyze and weigh the opinion evidence of Dr. Moyad and State Agency consultants Dr. Khong and Dr. Hartman with respect to their assessment of plaintiff's RFC and, thus, his determination is not supported by substantial evidence. (Doc. No. 17, p. 10.) Defendant argues these opinions were properly analyzed and weighed because Dr. Moyad's, Dr. Khong's and Dr. Hartman's  RFC assessments are inconsistent with a record as a whole, which demonstrated conservative routine treatment, many normal and mild examination findings and relatively normal activities of daily living. (Doc. No. 22, p. 6.)

A hierarchy exists with regard to the weighing of medical opinions, distinguishing between the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians). As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995). An examining physician's uncontradicted opinion cannot be rejected without the ALJ providing "clear and convincing reasons." Stewart v. Colvin, 575 Fed. Appx. 775, 777 (9th Cir. 2014). Even if contradicted, an examining physician's opinions is still owed deference and is entitled to the greatest weight even if it does not meet the test for controlling weight. Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007). When assigning little weight to an examining physician's opinion, the ALJ must set "out a detailed and thorough summary of the facts and conflicting clinical evidence, stating [her] interpretation thereof, and making findings." Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008).

Dr. Moyad is an examining non-treating physician who saw plaintiff on one occasion, on October 1, 2014. Dr. Khong and Dr. Hartman are non-treating, non-examining physicians, whose opinions were largely based on their review of Dr. Moyad's notes. The ALJ, who is solely responsible for determining a claimant's RFC, rejected these doctors' opinions only with regard to their assessment of plaintiff's RFC. See 20 C.F.R. §§ 416.927 (d), 416.945; SSR 96-5p; Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001) ("[i]t is clear that it is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity").

In rejecting these opinions, the ALJ did precisely what he was supposed to do – he discussed plaintiff's longitudinal medical history, the objective evidence and findings, each of the medical opinion evidence, assessed weight to the evidence and stated his reasons for discounting certain opinions. (AR 13-33); 20 C.F.R. § 416.920c (describing how the agency considers and articulates medical opinions)). He articulated clear and convincing reasons for finding Dr. Moyad and the State Agency Consultants' assessment of plaintiff's

RFC is not supported by the record on the whole. As noted in Section V, above, the ALJ observed the record is replete with medical records that show normal to mild findings with respect to plaintiff's back issues. (AR 24-26.) He cited numerous examples of medical evidence that are inconsistent with these doctors' RFC assessments including notes of: plaintiff denying any weakness or trembling (Id. at 24); normal exam findings (Id.); treatment throughout 2014, 2015 and 2016 of numerous instances where plaintiff's back pain had flared up but then later improved (Id. at 24-26); normal range of motion with his upper extremities (Id. at 25); normal motor strength and gait (Id. at 24-25); and conservative treatment (Id.). The Court notes nearly all these medical records are from treatment plaintiff received after Dr. Moyad and the State Agency Consultants formed their opinions and, thus, were not reviewed by any of these doctors. After these physicians' opinions were rendered, plaintiff: underwent physical therapy and reported improvement (consistent with Dr. Khong's projection); received pain management treatment; and was ruled out as a candidate for surgery because he had not exhausted his options for conservative treatment. Records of his later received treatment were not considered by Dr. Moyad or either State Agency Consultant when they formed their opinions.

Furthermore, inconsistency with the claimant's daily activities is a legitimate basis for devaluing a medical opinion. Ghanim v. Colvin, 763 F.3d 1154, 1162 (9th Cir. 2014). The RFC assigned by these doctors is inconsistent with plaintiff's own reports of his activities. As the ALJ correctly noted, the record includes numerous instances of plaintiff engaging in activities that are inconsistent with the physicians' RFC assessment. The ALJ observed that plaintiff: renovated a kitchen in February 2015 (AR 24-25); fell from a tree trying to cut a branch in March 2015 (Id. at 25); moved and lifted heavy furniture in June 2015 (Id.); started a new job that is physical in May 2016 (Id.); carried heavy counters and objects at work from June to August 2016 (AR 26); and built a retaining wall in July 2016 (Id.). These physically intensive activities, admitted to by plaintiff, demonstrate inconsistency with the opinions of Dr. Moyad, Dr. Khong and Dr. Hartman, who opined that plaintiff would have more restrictive physical limitations. See Shavin v. Com'r of

Social Sec. Admin., 488 Fed. Appx. 233, 224 (9th Cir. 2012) (inconsistencies and ambiguities with the record as a whole may be a sufficient reason to give little weight or devalue a medical opinion).

The ALJ had sufficient reason to weigh the opinion of Dr. Sabourin more heavily than the RFC assessments of Dr. Moyad and the State Agency Consultants. In reviewing contradictory medical opinions, it should be considered that early evaluations of a worsening condition are less probative than later evaluations. Delegans v. Colvin, 584 Fed. Appx. 328, 331 (9th Cir. 2014). When the claimant suffers from a progressively deteriorating health condition, as plaintiff does, the most recent medical report is the most probative. Stone v. Heckler, 761 F.2d 530, 532 (9th Cir. 1985). Here, Dr. Moyad and the State Agency Consultants' opinions regarding plaintiff's RFC are inconsistent with those of Dr. Sabourin, a board certified surgeon who conducted a consultative orthopedic consultation two years after Dr. Moyad's initial assessment and a year after the State Agency Consultants' review. Moreover, Dr. Sabourin's opinion as to plaintiff's RFC is consistent with the medical record on the whole so it was not improper for the ALJ to assign his RFC assessment greater weight. 20 C.F.R. § 416.927 (c)(3),(4) (more weight is given to an opinion and/or medical source if it is well-supported. . . and consistent with the record as a whole); SSR 96-6p (same).

In sum, the ALJ gave clear and convincing reasons supported by substantial evidence for why the opinions of Dr. Moyad and the State Agency Consultants should be afforded less weight, as they were inconsistent with the record as a whole.

**B. The ALJ Properly Analyzed and Weighed the Opinion of Plaintiff's Mother.**

Plaintiff also argues the ALJ failed to properly analyze and weigh the opinion evidence of his mother. (Doc. No. 17, p. 10).

"[L]ay testimony as to a plaintiff's symptoms is 'competent evidence' that an ALJ must consider and it must be taken into account." Lopez v. Astrue, 497 Fed. Appx. 717, 719 (9th Cir. 2012). It may not be rejected without comment. Id. "[I]f the ALJ wishes to discount the testimony of lay witnesses, he must give reasons that are germane to each

witness." <u>Lubin v. Commissioner of Social Sec. Admin.</u>, 507 Fed. Appx. 709, 712 (9th Cir. 2013). The fact that the lay opinion is from a family member is not grounds to reject it. <u>Goulart v. Colvin</u>, 604 Fed. Appx. 585, 586 (9th Cir. 2015). The ALJ may discount lay testimony when presented with contradictory evidence. <u>March v. Commissioner of Soc. Sec. Admin.</u>, 462 Fed. Appx. 671, 672 (9th Cir. 2011).

Here, the ALJ discounted the third party function report by plaintiff's mother because it was not supported by the record on the whole, which showed a history of conservative treatment, many normal and mild exam findings and that plaintiff engages in many activities of daily living. (AR 28.) As discussed in Section VII. A, *supra*, the record contains substantial evidence of conservative routine treatment and normal and mild exam findings that contradict the mother's statement. The ALJ also specifically commented on inconsistencies between her statement and plaintiff's self-reporting: of his typical daily activities to Dr. Shahla in September 2014, as well as to Dr. Engelhorn in November 2016 (<u>Id.</u>); in his function report which he completed in August 2014 (<u>Id.</u>); in his disability report prepared in March 2015 (AR 29); of his work history (<u>Id.</u>); of lifting and moving of heavy counters and objects in June 2016 (<u>Id.</u>); and of building a retaining wall in July 2016 (<u>Id.</u>). Thus, the ALJ gave legitimate and germane reasons, supported by substantial evidence, and properly discounted plaintiff's mother statement.

## VIII. CONCLUSION

For the reasons set forth above, plaintiff's Motion for Summary Judgment should be **DENIED** and defendant's cross-motion for summary judgment should be **GRANTED**.

This report and recommendation will be submitted to the Honorable Larry A. Burns, United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Any party may file written objections with the Court and serve a copy on all parties on or before **July 12, 2019**. The document should be captioned "Objections to Report and Recommendation." Any reply to the Objections shall be served and filed on or before **July 19, 2019**. The parties are advised that failure to file objections within the

3:18-CV-01624-LAB(KSC)

specified time may waive the right to appeal the district court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

**IT IS SO ORDERED.**

Dated:  June 28, 2019

Hon. Karen S. Crawford
United States Magistrate Judge